

JAMIE W. EADS, Plaintiff, v. MILFORD HOSPITAL, Defendant.

CIVIL ACTION NO. 3:10-cv-1153(VLB)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

*2011 U.S. Dist. LEXIS 17423*

February 23, 2011, Decided
February 23, 2011, Filed

**COUNSEL:** [*1] Jamie W. Eads, Plaintiff, Pro se, Milford, CT.

For Milford Hospital Inc, Defendant: Garie J. Mulcahey, LEAD ATTORNEY, Bai, Pollock, Blueweiss & Mulcahey, Shelton, CT.

**JUDGES:** Vanessa L. Bryant, United States District Judge.

**OPINION BY:** Vanessa L. Bryant

**OPINION**

MEMORANDUM OF DECISION GRANTING DEFENDANT'S MOTION TO DISMISS [DOC. #9]

The Plaintiff, Jamie Eads (hereinafter referred to as "Eads") brings suit against the Defendant, Milford Hospital, Inc. (the "Hospital") for alleged violations of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), *42 U.S.C. § 1395dd* in connection with three visits to the Defendant's emergency room on or about July 27, 2007. [Doc. #1]. The Defendant moves to dismiss the Plaintiff's Complaint pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure* for failure to state a claim for which relief can be granted. [Doc. #9]. For the reasons stated below, the Defendant's motion to dismiss is GRANTED as the Plaintiff's claim is barred by the EMTALA's two year statute of limitations.

I. Factual and Procedural Background

Pursuant to his complaint, the Plaintiff alleges that on July 27, 2007, he was rushed to the Hospital with a life threatening adverse reaction to medication and [*2] that Hospital staff "left the patient when they asked if he had insurance and employment and he responded no" and that the Hospital discharged Eads and instructed him to continue on one of his medications. Eads alleges that upon continuing the medication he returned to the Emergency Room a second time in critical condition, received a CT brain scan, and was again discharged with a potential drug reaction diagnosis. Eads further alleges that after a few hours he experienced trouble breathing and upon returning to the Hospital a third time, was scolded by Hospital personnel for returning via ambulance, and released with a diagnosis of anxiety after receiving a Chest CT scan. The Defendant alleges that an acute brain hemorrhage was clearly visible on CT scans of his brain, and that he subsequently suffered from symptoms of "brain damage, vision and breathing damage" and filed a complaint with the Connecticut Department of Public Health, but that the Department of Public Health failed to adequately investigate the matter. The Plaintiff's complaint to the Department of Public Health reflects that he reported that the three aforementioned visits to the emergency room took place on July 27, [*3] 2007 and July 28, 2007[1].

1    For the purposes of *Federal Rule of Civil Procedure 12(b)(6)*, "the complaint Is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc. 282 F.3d 147, 152 (2d Cir. 2002).*

II. Discussion

A. Standard of Review

"Under *Federal Rule of Civil Procedure 8(a)(2)*, a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ash-*

croft v. Iqbal, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). While Rule 8 does not require detailed factual allegations, "[a] pleading that offers 'labels and conclusions' or 'formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (internal quotations omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable   [*4] for the misconduct alleged." Id. (internal citations omitted).

In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint. Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010). "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" Id. (quoting Iqbal, 129 S. Ct. at 1949-50). "At the second step, a court should determine whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" Id. (quoting Iqbal, 129 S. Ct. at 1950). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 129 S. Ct. at 1949 (internal quotation marks omitted).

B. Sufficiency of the Plaintiff's EMTALA Claim

The Defendant asserts that the Plaintiff's claim must be dismissed because he did not allege that the Hospital failed to perform an adequate medical screening examination and also because plaintiffs are barred from using the EMTALA to circumvent state remedies   [*5] for medical malpractice or medical negligence.

The EMTALA applies to hospitals that participate in the federal Medicare program. Hardy v. New York City Health & Hosps., 164 F.3d 789, 792 (2d Cir. 1999). To state a claim under the EMTALA, Eads must allege that he (1) went to the Defendant's emergency room (2) suffering from an emergency medical condition, and that the Hospital either (3) failed to adequately screen him to determine whether he had such a condition, or (4) discharged or transferred him before the emergency condition was stabilized. Id.; Fisher v. New York Health & Hosps. Corp., 989 F. Supp. 444, 448 (E.D.N.Y. 1998); Owens v. Presbyterian Hosp., No. 94 Civ. 6004 (RPP), 1995 U.S. Dist. LEXIS 11058, 1995 WL 464950, at *1 (S.D.N.Y., Aug. 3, 1995). In turn, the EMTALA defines an "emergency medical condition" as:

(A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in - -

(i) placing the health of an individual . . . in serious jeopardy,
(ii) serious impairment to bodily functions, or
(iii) serious dysfunction of any bodily organ or part . . .

42 U.S.C. § 1395dd(e)(1)(A).   [*6] Further the statute defines "to stabilize" as "to provide such medical treatment of the [emergency medical] condition as may be necessary to assure, within reasonable medical probability that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility . . ." and that "stabilized" means "no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer [including discharge] of the individual from a facility . . . ." 42 U.S.C. § 1395dd(e)(3)(A)-(B).

The Second Circuit has explained that the

EMTALA is not a substitute for state law on medical malpractice. It was not intended to guarantee proper diagnosis or to provide a federal remedy for misdiagnosis or medical negligence. Instead, EMTALA was enacted to fill a lacuna in traditional state tort law by imposing on hospitals a legal duty (that the common law did not recognize) to provide emergency care to all.

Hardy, 164 F.3d at 792 (internal citations and quotation marks omitted). Therefore, while the "legislative history of EMTALA demonstrates that Congress never intended to displace state malpractice   [*7] law," Id. at 793, EMTALA does obligate hospitals participating in the federal Medicare program to conduct an appropriate medical screening examination to determine if an emergency medical condition exists, and to stabilize such a medical condition before transfer or discharge. Id. at 792.

Upon reviewing the Complaint, it is not apparent that Eads, as a *pro se* plaintiff, fails to plead sufficient factual content, or more so that he is unable to plead sufficient factual content if provided leave to amend his complaint, to give his asserted claim facial plausibility. *See Iqbal, 129 S. Ct. at 1949 (2009)* (stating that a complaint "must contain sufficient factual matter accepted as true, to state a claim to relief that is plausible on its face.") (internal citation and quotation marks omitted); *See also Shomo v. City of New York, 579 F.3d 176, 183 (2d Cir. 2009)* (stating that a *pro se* complaint is to be read liberally and should not be dismissed without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated") (internal citation and quotation marks omitted).

The Plaintiff alleges that during multiple visits to the [*8] emergency room the Defendant was released following assessment with diagnoses such as anxiety, and adverse drug reaction, and in doing so failed to review results of CT scans of his brain which he alleges showed a clearly visible acute brain hemorrhage, and that "[e]mergency staff left the patient when they asked if he had insurance and employment and he responded no." [Doc. #1]. The Complaint therefore could be interpreted, particularly with further factual allegations, as an indication that the Defendant Hospital curtailed what would otherwise be its standard treatment of the Plaintiff upon learning of his lack of means to pay for treatment, and failed to adequately stabilize an emergency medical condition relating to the alleged brain hemorrhage.

Nevertheless, such speculation or further amendment is unhelpful and futile, as the Plaintiff's cause of action is barred by the EMTALA's two year statute of limitations as the statute mandates that "[n]o actions may be brought . . . more than two years after the date of the violation with respect to which the action is brought." *42 U.S.C. § 1395dd(d)(2)(C)*. The Plaintiff filed his complaint on July 26, 2010, but the date of the alleged [*9] violation, as reflected by his complaint, are the dates of the Plaintiff's three hospital visits between July 27, 2007 and July 28, 2007, during which the Plaintiff allegedly received inadequate care. Accordingly, the statute of limitations expired nearly a year before the date of this action's filing and the Plaintiff's claim is time-barred. *See Owens, 1995 U.S. Dist. LEXIS 11058, 1995 WL 464950* (dismissing plaintiff's complaint because it was time barred even though the complaint adequately pleaded a cause of action under the EMTALA).

## III. CONCLUSION

Based on the above reasoning, the Defendant's motion to dismiss [Doc. #9] is GRANTED. The Clerk is directed to close this case.

IT IS SO ORDERED.

/s/

Vanessa L. Bryant

United States District Judge

Dated at Hartford Connecticut: February 23, 2011.



**ROBERT MACAMAUX, Plaintiff, v. DAY KIMBALL HOSPITAL, Defendant.**

**CIVIL CASE NO. 3:09-CV-164 (JCH)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT**

*2011 U.S. Dist. LEXIS 105449*

**September 16, 2011, Decided**
**September 16, 2011, Filed**

**SUBSEQUENT HISTORY:** Reconsideration denied by *Macamaux v. Day Kimball Hosp., 2011 U.S. Dist. LEXIS 116022 (D. Conn., Oct. 6, 2011)*

**PRIOR HISTORY:** *Macamaux v. Day Kimball Hosp., 702 F. Supp. 2d 25, 2010 U.S. Dist. LEXIS 26078 (D. Conn., 2010)*

**COUNSEL:**  [*1] For Robert Macamaux, Plaintiff: Amato A. DeLuca, Michael T. Eskey, Miriam Weizenbaum, LEAD ATTORNEYS, PRO HAC VICE, DeLuca & Weizenbaum, LTD.-RI, Providence, RI; John D. Jessep, LEAD ATTORNEY, Koskoff, Koskoff & Bieder, P.C., Bridgeport, CT.

For Day Kimball Hospital, Defendant: Jay M. Elias, LEAD ATTORNEY, Ratcliffe Burke Harten & Elias, LLP-RI, Providence, RI; Stephen V. Manning, LEAD ATTORNEY, O'Brien, Tanski & Young, Hartford, CT.

**JUDGES:** Janet C. Hall, United States District Judge.

**OPINION BY:** Janet C. Hall

**OPINION**

**RULING RE: MOTION FOR SUMMARY JUDGMENT (DOC. NO. 117)**

**I. INTRODUCTION**

The claims in this action arise from the medical evaluation and treatment provided by defendant, Day Kimball Hospital, to plaintiff, Robert Macamaux, following an automobile accident. In an Amended Complaint, Macamaux asserts six causes of action under federal and state law. Day Kimball has moved for summary judgment regarding three of these claims: Count I, a claim for failure to provide an appropriate medical screening examination as required by the Emergency Medical Treatment and Active Labor Act (EMTALA), *42 U.S.C. § 1395dd(a)*; Count II, a claim for failure to stabilize an emergency medical condition as required by EMTALA, *42 U.S.C. § 1395dd(b)*;  [*2] and Count IV, a state law claim for failure to obtain Macamaux's informed consent. Counts III, V, and VI of the Amended Complaint are not at issue here. For the reasons that follow, Day Kimball's Motion is granted in part and denied in part.

**II. FACTS**[1]

    1    Unless otherwise cited, the following facts are based upon the uncontested portions of the parties' *Local Rule 56(a)* Statements.

At approximately 4:00 pm on January 16, 2006, Macamaux was in a traffic accident while traveling on Interstate 395 in Plainfield, Connecticut. Based on Macamaux's complaint of neck pain, the first responders on the scene placed Macamaux on a backboard and fitted him with a cervical collar. Macamaux was then transported by ambulance to Day Kimball Hospital in Connecticut, arriving at 4:54 p.m.

At Day Kimball's emergency department, the triage nurse assessed Macamaux and noted that he complained of neck and back pain and pain between the shoulders. Subsequently, Macamaux was examined by Dr. Nelson, a board certified emergency physician on duty, and Macamaux was registered in Day Kimball's computer system as complaining of "upper back pain." Dr. Nelson ordered x-rays for cervical spine trauma and x-rays of the chest.  [*3] At the time the x-rays were ordered, no ra-

diologists were scheduled to be on duty. In such circumstances, Day Kimball policy calls for the x-rays to be read in the first instance by the emergency department, i.e., by Dr. Nelson, and reviewed later by a radiologist during a subsequent shift. In his deposition, Dr. Nelson testified that he interpreted these x-ray images and then reassessed Macamaux and found that Macamaux had scapula pain, but no neck pain or tenderness. Nelson Dep. (Pl. Ex. 3) at 52-53, 58. These findings are not recorded in the medical record. See Pl. Ex. 11.

By 6:30 p.m., Dr. Nelson ordered a CT scan of Macamaux's chest and a blood alcohol test. However, Dr. Nelson canceled these tests at 6:35 p.m. Dr. Nelson testified that he had spoken to Macamaux about "getting a CT scan of his chest and he wanted to leave. That's why these orders were canceled." Nelson Dep. at 58; see id. at 91. However, Macamaux was not then discharged. At approximately 6:40 p.m., Dr. Nelson ordered additional x-rays, including chest x-rays, an x-ray of the left scapula, and a lateral x-ray of the cervical spine. Dr. Nelson testified that he ordered these additional x-rays "because this first   [*4] group was not adequate in my opinion." Id. at 58.

At 7:25 p.m., after interpreting the second set of x-rays, Dr. Nelson evaluated Macamaux again and determined to discharge him. At that time, Dr. Nelson noted, "Home with son. Stable." At 7:45 p.m., Macamaux was discharged with a diagnosis of "MVA, Back strain." In a typewritten report prepared eleven days later, Dr. Nelson states that, while at Day Kimball, Macamaux had denied having neck pain, that Dr. Nelson had ordered a "minimum of 4 views" with "no fractures seen." Macamaux claims that he did not deny having neck pain.

Day Kimball's Diagnostic Services Manual contains a policy regarding the images that must be taken when cervical spine trauma x-rays are ordered. That policy lists a number of steps that "must be performed," including taking the following cervical images: a "Shoot-thru Lateral," a "Swimmer's," and "AP and Odontoid films." Day Kimball Policy DI: Trauma Procedure (Pl. Ex. 10 at 13-15). Regarding the "Swimmer's" image, the policy states, "C7-T1 junction MUST be clearly visualized." Id. The policy further indicates that the reviewing "physician will notify the technologist whether or not the patient needs any additional   [*5] films." Id. (Pl. Ex. 10 at 14). That was apparently not done here.

On January 17, 2006, the day after Macamaux was discharged, his x-rays were reviewed by Dr. Millard, a board certified radiologist at Day Kimball. Dr. Millard's report noted that, in the first set of x-rays taken, "[t]he C7 vertebral body is not well seen," and that, in the second set taken, the "C7 vertebral body is not included on examination." Dr. Millard's report indicates that the ina-

bility to see the C7 vertebra is due to the "difficulty in penetrating the patient's shoulders." A subsequent review by plaintiff's medical expert confirmed that the images did not permit visualization of the C7 vertebra due to difficulty penetrating the patient's shoulders. Based on Dr. Millard's finding, a physician's assistant at Day Kimball ordered that there be a follow up communication with Macamaux with a recommendation that Macamaux see a physician for follow up. A letter was sent to Macamaux four days later, on January 21, 2006.

On January 19, 2006, two days before the letter was sent, Macamaux began to experience neck pain, arm pain, swelling of his throat, and difficulty breathing, and he checked himself into the emergency   [*6] department at Landmark Medical Center in Rhode Island. A CT scan of the cervical spine was performed, revealing multiple fractures and significant dislocation at the C7-T1 junction. Macamaux was immobilized and transferred to Rhode Island Hospital, where he underwent surgery to stabilize his spine. After ten days, on January 30, 2006, Macamaux was discharged to Rehabilitation Hospital for physical and occupational therapy, and on February 3, 2006, he was discharged from Rehabilitation Hospital.

Macamaux admits that he would have required spinal surgery regardless of when the fracture was diagnosed, but contends that, due to the delay in diagnosis, he suffered permanent spinal cord injury and neurological deficits, including pain, weakness and limited ability to use his shoulders, neck, and upper extremities. Macamaux claims that he has been unable to return to work as a result.

### III. SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*; *White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000).*   [*7] Once the moving party has met its burden, in order to defeat the motion, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," *Anderson, 477 U.S. at 255*, and present such evidence as would allow a jury to find in his favor. *Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).*

In assessing the record to address questions of fact, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. *Anderson, 477 U.S. at 255*; *Graham, 230 F.3d at 38*. Summary judgment "is properly granted only when no rational finder of fact could find in favor of the non-moving party." *Carlton v. Mystic Transp., Inc.,*

*202 F.3d 129, 134 (2d Cir. 2000)*. "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the finder of fact. *Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000)*.

## IV. DISCUSSION

### A. Failure to Provide Appropriate Screening Pursuant to EMTALA (Count I)

EMTALA requires that, when a person is presented to a hospital emergency department for examination [*8] or treatment,

> the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition . . . exists.

*42 U.S.C. § 1395dd(a)*. The term, "appropriate medical screening xamination," is not defined in the statute.

Courts have consistently held that this screening requirement does not impose a general federal law against malpractice or negligent diagnosis. See, e.g., *Hardy v. New York City Health & Hosps. Corp., 164 F.3d 789, 792 (2d Cir. 1999)* ("EMTALA is not a substitute for state law on medical malpractice. It was 'not intended to guarantee proper diagnosis or to provide a federal remedy for misdiagnosis or medical negligence.'" (quoting *Power v. Arlington Hosp. Ass'n, 42 F.3d 851, 856 (4th Cir. 1994)*); *Gatewood v. Washington Healthcare Corp., 933 F.2d 1037, 1041, 290 U.S. App. D.C. 31 (D.C. Cir. 1991)* ("[W]e cannot agree that [EMTALA] creates a sweeping federal cause of action with respect to what are traditional state-based claims of negligence or malpractice.").

Instead, EMTALA requires hospitals to provide uniform [*9] or even-handed screening examinations for emergency conditions, consistent with their own policies and based on the hospital's capabilities and the medical circumstances and symptoms presented. See, e.g., *Marshall v. East Carroll Parish Hosp., 134 F.3d 319, 323 (5th Cir. 1998)* ("Most of the courts that have interpreted ['appropriate medical screening examination'] have defined it as a screening examination that the hospital would have offered to any other patient in a similar condition with similar symptoms." (citing numerous cases)); *Brooks v. Maryland Gen. Hosp. Inc., 996 F.2d 708, 710-11 (4th Cir. 1993)* (Under EMTALA, "the hospital must apply its standard of screening uniformly to all emergency room patients, regardless of whether they are insured or can pay." (emphasis in original)); *Gatewood, 933 F.2d at 1041* ("[T]he Act is intended . . . to ensure that each is accorded the same level of treatment regularly provided to patients in similar medical circumstances."). A hospital violates this requirement if it fails to provide a screening consistent with its own standard screening procedures for the issue presented. See *Correa v. Hospital San Francisco, 69 F.3d 1184, 1192 (1st Cir. 1995)* [*10] ("[A] refusal to follow regular screening procedures in a particular instance contravenes the statute . . . ."); *Repp v. Anadarko Mun. Hosp., 43 F.3d 519, 522 (10th Cir. 1994)* ("[A] hospital violates *section 1395dd(a)* when it does not follow its own standard procedures."); *Gatewood, 933 F.2d at 1041* ("Thus, what constitutes an 'appropriate' screening is properly determined . . . by reference to a hospital's standard screening procedures. . . . [A]ny departure from standard screening procedures constitutes inappropriate screening in violation of the Emergency Act.").

On the record submitted here, there is a material issue of fact as to whether or not Day Kimball performed a screening examination that conformed to its own standard screening procedures. Macamaux was transported to Day Kimball on a backboard, with a cervical collar, following an automobile accident, complaining of neck and back pain. Dr. Nelson, the physician who examined Macamaux, ordered x-rays for cervical spine trauma. Day Kimball policy provides that when a patient is sent from the emergency department to the radiology department for diagnostic imaging of possible cervical spine trauma, the radiology department "must" [*11] take certain specific types of images, and that in one of these images the "C7-T1 junction MUST be clearly visualized." Day Kimball Policy No. DI: Trauma Procedure (Pl. Ex. 10 at 13, 15) (emphasis omitted). The policy further indicates that, if these tests are ordered when a radiologist is not on duty, as was the case here, the images will be brought to the Emergency Department for the physician to review, and the "physician will notify the technologist whether or not the patient needs any additional films." Id. (Pl. Ex. 10 at 14). It is uncontested that none of the x-rays received and reviewed by Dr. Nelson permitted him to see and evaluate the C7 vertebrae or the C7-T1 junction. Indeed, Day Kimball's radiologist confirmed that the "C7 vertebral body is not well seen" and that "the C7 vertebral body is not included on the examination." Day Kimball Medical Records (Pl. Ex. 11) at 8-9. Thus, it is uncontested that, despite hospital policy that the "C7-T1 junction MUST be clearly visualized," Dr. Nelson discharged Macamaux without obtaining x-ray images that permitted him to see the C7 vertebra or the C7-T1 junction. One might argue that is not

only sufficient to survive summary judgment, [*12] but to establish liability under EMTALA. See *Gatewood, 933 F.2d at 1041* ("[A]ny departure from standard screening procedures constitutes inappropriate screening in violation of the Emergency Act.").

Day Kimball argues that the departure from policy in this case cannot support an EMTALA claim because the policy requiring an image showing the C7-T1 junction is addressed to the radiology department, not the emergency department. However, Day Kimball cites no authority that EMTALA liability may be founded only on a failure to follow policies directed specifically at the emergency department. [2] In an attempt to support such a limitation, Day Kimball asserts that the "obligations of EMTALA are imposed upon the Emergency Department of hospital," Reply at 3, but the text of the statute says otherwise. EMTALA expressly imposes a duty and a corresponding liability upon hospitals, not specifically upon emergency departments: "the hospital must provide an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department . . . ." *42 U.S.C. § 1395dd(a).* [3] Accordingly, a hospital may [*13] be liable regardless of whether the hospital's failure to provide an appropriate screening examination might be more specifically assigned to the emergency department itself or to an ancillary service working in conjunction with the emergency department, such as the radiology department. [4]

2   Such a rule would be absurd. Under that construction of the statute, a hospital would not be liable if it secretly directed its labs and radiology department not to follow their policies in the case of uninsured emergency patients, but instead to prepare fake reports or images so that emergency department doctors would discharge such patients under the impression that an adequate screening had been performed.

3   The case law consistently reflects the plain statutory language that Day Kimball ignores. See, e.g., *Hardy, 164 F.3d at 792* ("EMTALA . . . imposes two primary obligations on . . . hospitals." (emphasis added)); *Repp, 43 F.3d at 522* ("[A] hospital violates *section 1395dd(a)* when it does not follow its own standard procedures." (emphasis added)); *Power, 42 F.3d at 856* ("The key requirement is that a hospital apply its standard of screening uniformly to all emergency room patients . . . ." (emphasis [*14] altered; quotation omitted)); *Gatewood, 933 F.2d at 1039* (EMTALA "imposes on Medicare-provider hospitals a duty to afford medical screening . . . ." (emphasis added)).

4   It bears noting that, under the circumstances of this case, it fell to the emergency department doctor to read the insufficient x-rays.

In any case, Day Kimball cites no evidence that discharging patients based on images that do not meet the terms of this diagnostic policy is within the standard screening practice of Day Kimball's emergency department. Day Kimball cites testimony that the policies are part of the "Diagnostic Services Manual" and that they provide instruction to "technologists [regarding the] procedure for doing trauma C spines." Slota Dep. (Reply Ex. 1) at 21, 26. This testimony does not rule out the possibility that the policy also reflects Day Kimball's expectations for its emergency department practice. Indeed, a finder of fact could reasonably infer that, if Day Kimball insists that an x-ray "MUST" show the C7-T1 junction, this is because the standard screening procedure for cervical spine trauma involves consideration of such an image.

Moreover, Dr. Nelson testified that an examination of cervical [*15] spine trauma is inadequate if the C7 vertebral body is not included, and that the appropriate measure to take in such a case is to order a "repeat film and do whatever's necessary." Nelson Dep. (Pl. Ex. 3) at 79-80. Plaintiff's expert similarly testified that, if "it is necessary to image the cervical spine at all, then it is necessary to image the entire cervical spine or else it is not a complete study." Johnson Dep. (Pl. Ex. 5) at 84. This testimony does not distinguish between the standard of care applicable in a malpractice claim and the standard screening practice at Day Kimball, which is relevant under EMTALA. Nonetheless, given such testimony and the written policy, a fact-finder could reasonably infer that Day Kimball's standard screening for cervical spine trauma includes obtaining and reviewing films that actually reveal the C7 vertebra prior to discharge.

The policy and medical testimony also prevents the court from deciding, as a matter of law, whether this is a case of misdiagnosis based upon an appropriate screening examination or a case of failure to provide an appropriate screening examination. See Def. Mem. at 25-26; *Power, 42 F.3d at 859* ("[I]f [the standard tests] [*16] are performed and the doctor evaluating the results draws an incorrect conclusion, a violation of EMTALA may not be established, but medical negligence may be." (quotation omitted)). Day Kimball does not cite any evidence that conclusively explains why Dr. Nelson would order a second set of x-rays, after finding the first to be inadequate, and then discharge Macamaux after obtaining a second set of deficient x-rays. Given the diagnostic imaging policy and Dr. Nelson's own testimony, the finder of fact could reasonably conclude that Day Kimball provided Macamaux with a materially incomplete screening examination.

Finally, Day Kimball argues that it is entitled to summary judgment because Macamaux has failed to establish that it acted with an improper motive. Only the Sixth Circuit has suggested that proof of motive is required for an EMTALA screening claim. See *Cleland v. Bronson Health Care Group, Inc.,917 F.2d 266, 272 (6th Cir. 1990)* ("'[A]ppropriate' must more correctly be interpreted to refer to the motives with which the hospital acts."). [5] Every other circuit to consider the issue has held that the statute does not support this interpretation. See *Phillips v. Hillcrest Medical Center, 244 F.3d 790, 798 (10th Cir. 2001)* [*17] ("EMTALA looks only at the participating hospital's actions, not motives."); *Summers v. Baptist Medical Center Arkadelphia, 91 F.3d 1132, 1138 (8th Cir. 1996)* (en banc) ("[T]he statute contains no such requirement . . . ."); *Power, 42 F.3d at 857 (4th Cir.)* ("We are persuaded that the D.C. Circuit's rejection of an improper motive requirement is indeed the correct approach."); *Burditt v. U.S. Dep't of Health and Human Services, 934 F.2d 1362, 1373 (5th Cir. 1991)* ("As written, EMTALA prevents patient dumping without [an improper motive] requirement. We refuse to alter the statutory scheme." (citation omitted)); *Gatewood, 933 F.2d at 1041 & n.3 (D.C. Cir.)* ("We do not read *subsection 1395dd(a)* as referring in any way to the 'motives' with which an emergency room acts when it provides something less than its normal screening procedure."). This latter group of decisions is persuasive. The statutory language does not reflect any concern with motives. See *42 U.S.C. § 1395dd(a).* Therefore, Macamaux is not required to show that Day Kimball acted with an improper motive in order to prevail on his EMTALA screening claim.

> 5  Day Kimball contends that *Holcomb v. Monahan, 30 F.3d 116 (11th Cir. 1994),* [*18] also supports an improper motive requirement. That decision does not mention, much less support, such a requirement.

In sum, there is a material issue of fact as to whether Day Kimball provided a screening examination consistent with its own standard screening practice for cervical spine trauma prior to discharging Macamaux. Therefore, Day Kimball's Motion for Summary Judgment is denied with respect to Count I.

**B. Failure to Stabilize Pursuant to EMTALA (Count II)**

In addition to requiring an appropriate medical screening, EMTALA requires stabilization of any known emergency medical conditions prior to discharge. Specifically, the statute provides:

> If any individual . . . comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either . . . such treatment as may be required to stabilize the medical condition, or [a transfer to another medical facility, under conditions further specified in subsection *1395dd(c)*].

*42 U.S.C. § 1395dd(b).* In Count II, Macamaux alleges that Day Kimball violated this requirement by discharging him without stabilizing his condition or providing him with an appropriate transfer.

The statutory [*19] language indicates that EMTALA's stabilize or transfer requirement applies only where the hospital "determines" that the individual has an emergency medical condition. *42 U.S.C. § 1395dd(b).* This language has been interpreted to require "actual knowledge," or diagnosis, of the emergency medical condition. See, e.g., *Torretti v. Main Line Hospitals, Inc., 580 F.3d 168, 178 (3d Cir. 2009)* (A claim for violation of *subsection 1395(b)* "requires that . . . the hospital actually knew of [plaintiff's emergency medical] condition . . . ."); *Bryant v. Adventist Health System/West, 289 F.3d 1162, 1166 (9th Cir. 2002)* ("[A] hospital has a duty to stabilize only those medical conditions that its staff detects."); *Battle v. Mem. Hosp. at Gulfport, 228 F.3d 544, 558 (5th Cir. 2000)* ("The duty to stabilize does not arise unless the hospital has actual knowledge that the patient has an unstabilized medical emergency."); *Summers, 91 F.3d at 1140* ("[U]nder the express wording of the statute, this portion of EMTALA applies only if the hospital determines that the individual has an emergency medical condition . . . ." (emphasis in original; quotation omitted)); *Holcomb v. Monahan, 30 F.3d 116, 117 (11th Cir. 1994)* [*20] ("To succeed on a *section 1395dd(b)* claim, a plaintiff must present evidence that . . . the hospital knew of the [emergency medical] condition . . . ."); *Gatewood, 933 F.2d at 1041* ("Here, no such [emergency] condition was diagnosed, and the statute's stabilization and transfer requirements are therefore inapplicable.").

The statute defines an emergency medical condition as

> a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—
>
> > (i) placing the health of the individual . . . in serious jeopardy,

(ii) serious impairment to bodily functions, or

(iii) serious dysfunction of any bodily organ or part[.]

*42 U.S.C. § 1395dd(e)(1)(A).*

Macamaux admits that his emergency medical condition--a fractured C7 vertebra--was not diagnosed prior to his discharge. See Pl. L.R. 56(a)(2) St. at 8, ¶ 5 ("[T]he scans performs did not permit full visualization of Plaintiff's spine, specifically the C7 vertebral body could not be seen."). Macamaux admits that he was discharged "with a diagnosis of 'MVA, back strain,'" Pl. L.R. 56(a)(2) St. at 2, ¶ 20, and with "a diagnosis [*21] of contusions of the shoulder and scapular region," Pl. L.R. 56(a)(2) St. at 9, ¶ 13. Significantly, Macamaux also admits that, as a result of the inadequate scans, Day Kimball had not determined that he had a condition requiring stabilization. Pl. L.R. 56(a)(2) St. at 8, ¶ 9 ("Because the imaging did not present a complete picture of the Plaintiff's cervical spine, the scans did not show that Plaintiff had a fracture injury to his spine requiring stabilization, immediate care and treatment.").

Nonetheless, Macamaux argues that he may prevail on his stabilization claim because Day Kimball "was well aware of the potential severity of Plaintiff's injuries before his discharge." Opp. at 16 [*22] (emphasis added). In support of this assertion, Macamaux cites only the evidence that the diagnostic images obtained by Dr. Nelson did not rule out his emergency medical condition. This is not sufficient to create a material issue of fact on a claim under EMTALA's stabilization requirement. Evidence that Day Kimball had not adequately ruled out a C7 fracture does not support an inference that Day Kimball had actual knowledge that Macamaux had an emergency medical condition, as required by the statute.

Macamaux seeks to draw an analogy to the Fifth Circuit's decision in *Battle, 228 F.3d 544.* There, the court permitted plaintiff to proceed on an EMTALA stabilization claim although the record indicated that hospital had not correctly diagnosed the patient's underlying medical condition at the time of the discharge. However, in doing so, the Fifth Circuit relied on the fact that, prior to discharge, the doctor had diagnosed the patient as having another medical condition--seizure disorder--and on expert testimony that that condition was an emergency medical condition requiring stabilization. See *Battle, 228 F.3d at 559.* Here, there is no evidence that any medical professional at Day Kimball [*23] had diagnosed Macamaux as having any emergency medical condition prior to discharge. Macamaux's argument is essentially that Dr. Nelson had a reason to suspect an

emergency medical condition and did not do enough to investigate that suspicion. This may be sufficient to establish an EMTALA screening claim or a claim for negligence, but it does not create a material issue of fact as to the actual knowledge requirement for an EMTALA stabilization claim.

Macamaux has failed to show that there is any issue of fact regarding an essential element of his EMTALA stabilization claim. Therefore, Day Kimball is entitled to summary judgment on Count II.

## C. Lack of Informed Consent (Count IV)

In Count IV, Macamaux alleges that Day Kimball is liable for failing to obtain his informed consent "to the treatment and care Defendant Day Kimball proposed to administer and perform upon him . . . ." Amended Complaint at 4, ¶ 2. Macamaux does not indicate any procedure or affirmative form of treatment that Day Kimball performed without his informed consent. Rather, it appears that the "treatment and care" at issue is the decision to discharge him without further treatment or testing. See Opp. at 18 ("If Plaintiff [*24] had been informed of [the inadequate evaluation of his spine], he might have insisted on additional or different scans, or else sought treatment at another hospital.").

The Connecticut Supreme Court has explained that a medical malpractice claim based on lack of informed consent derives from the right against bodily intrusions that underlies the intentional torts of assault and battery:

> The informed consent doctrine derives from the principle that "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent, commits an assault, for which he is liable in damages."

*Sherwood v. Danbury Hosp., 278 Conn. 163, 180, 896 A.2d 777 (2006)* (quoting *Logan v. Greenwich Hospital Ass'n, 191 Conn. 282, 288-89, 465 A.2d 294 (1983)).* A claim based on lack of informed consent is nonetheless analyzed as a claim for negligence, as it tests the doctor's performance of his "duty to exercise due care in informing a patient of medical risks." *Sherwood, 278 Conn. at 180* (quotation omitted); see *Logan, 191 Conn. at 299.*

Under Connecticut law, "the doctrine of informed consent is a limited one." *Duffy v. Flagg, 279 Conn. 682, 693, 905 A.2d 15 (2006)* [*25] (quotation omitted). In 2001, the Connecticut Supreme Court observed that "[a]ll of the informed consent cases in Connecticut have

involved the adequacy of information disclosed regarding the procedure and treatment to be performed." *Alswanger v. Smego, 257 Conn. 58, 67, 776 A.2d 444 (2001)* (collecting cases). All of the cases cited by Macamaux involve claims based upon medical procedures actually performed upon a person. See *Duffy, 279 Conn. 682, 905 A.2d 15* (vaginal birth after cesarean section resulting in the need for emergency surgery); *Sherwood, 278 Conn. 163, 896 A.2d 777* (blood transfusion resulting in HIV infection); *Janusauskas v. Fichman, 264 Conn. 796, 826 A.2d 1066 (2003)* (radial keratotomy procedure resulting in loss of vision); *Logan, 191 Conn. 282, 465 A.2d 294* (biopsy of the kidney resulting in punctured gallbladder). Furthermore, in each case, the Connecticut Supreme Court has explained the relevant duty as a duty to provide information about the procedure to be performed upon the patient:

> [O]ur inquiry has been confined to whether the physician has disclosed: "(1) the nature of the procedure, (2) the risks and hazards of the procedure, (3) the alternatives to the procedure, and (4) the anticipated benefits of the procedure."

*Sherwood, 278 Conn. at 180* [*26] (quoting *Logan, 191 Conn. at 292*); accord *Duffy, 279 Conn. at 692*; *Janusauskas, 264 Conn. at 810 n.12*; *Alswanger, 257 Conn. at 67-68*.

Macamaux has cited no case in which any court has permitted a claim for lack of informed consent based on a decision to discharge a patient without additional medical testing or medical care. Such a claim is not supported by the underlying principles that a person has a right to decide what is done to his body and that a procedure performed without consent is an assault upon the person. See *Sherwood, 278 Conn. at 180*. Rather, such a claim would reflect an extension of the doctrine of informed consent beyond that underlying basis.

The Connecticut Superior Court has rejected this extension of informed consent. In Glover v. Griffin Health Services, the court held as follows:

> [P]laintiff's claims are based on allegations that the defendants failed to inform her of the limitations, results, findings, or significance of her CT scan, MRI, lumbar puncture and examinations, and that the defendants failed to inform her of additional tests or studies that were available. . . . Thus, the plaintiff's informed consent claims are devoid of any allegations of [*27] a failure to inform her of the risks or

alternatives associated with a particular treatment or procedure that she received, and as such, fail to assert the requisite elements of this cause of action as set forth by Connecticut cases.

*2006 Conn. Super. LEXIS 1841, 2006 WL 1828605, *4 (Conn. Super. June 21, 2006)*. In a subsequent similar case, the Superior Court followed Glover where the plaintiffs' doctor failed to diagnose a serious condition revealed by a fetal ultrasound examination. See *Rich v. Foye, 51 Conn. Supp. 11, 34-35, 976 A.2d 819 (Conn. Super. 2007)*. The Rich court similarly held that a claim for lack of informed consent could not be based on a failure to inform the patient properly of the results and the limits of the testing performed. See id.

Further, in both cases, as in the present case, the doctor had misdiagnosed or failed to detect the problematic medical condition, and in both cases, the court held that such claims are more appropriately framed as claims for negligent misdiagnosis. See id.; *Glover, 2006 Conn. Super. LEXIS 1841, 2006 WL 1828605, *4-*5* (citing *Backlund v. University of Washington, 137 Wash. 2d 651, 661 n.2, 975 P.2d 950 (1999)*; *Roukounakis v. Messer, 63 Mass. App. 482, 487, 826 N.E.2d 777 (2005)*). Macamaux [*28] asserts such a claim in Count III of the Amended Complaint.

In sum, decisions of the Connecticut Supreme Court do not support a claim for lack of informed consent where a doctor fails to diagnose a condition, fails to inform the patient of the shortcomings of the diagnostic examination, and therefore, fails to treat the condition. Connecticut's lower courts have expressly rejected an extension of the doctrine of informed consent to such circumstances. Further, Connecticut law provides an opportunity for redress in such circumstances in the form of a claim for negligent misdiagnosis and treatment, a claim which is separately alleged here. Accordingly, the court holds that the doctrine of informed consent does not extend to the circumstances presented here. Day Kimball is entitled to summary judgment on Count IV.

## V. CONCLUSION

For the foregoing reasons, Day Kimball's Motion for Summary Judgment is **granted in part** and **denied in part**. It is granted with respect to Counts II and IV, and denied with respect to Count I.

**SO ORDERED.**

Dated at Bridgeport, Connecticut, this 16th day of September, 2011.

/s/ Janet C. Hall

2011 U.S. Dist. LEXIS 105449, *

Janet C. Hall                                United States District Judge



LILLIEMAE VAZQUEZ, on behalf of Herself and her deceased son, PETER SA-
LINAS, JR., Plaintiffs, -against- NEW YORK CITY HEALTH AND HOSPITALS
CORPORATION; CONEY ISLAND HOSPITAL; MAIMONIDES MEDICAL
CENTER; DR. YOUSEF, DR. TAN, and DR. JOACHIM KAPALANGA; and DR.
JOHN DOE(S) and DR. JANE DOE(S), each in Their official and individual capaci-
ties, Defendants.

98 Civ. 7922 (DAB)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

*2000 U.S. Dist. LEXIS 5614*

February 3, 2000, Decided
February 4, 2000, Filed

**DISPOSITION:** [*1] Defendants' Motion to Dis-
miss GRANTED. This action DISMISSED as against
Defendants Maimonides and Dr. Kapalanga.

**COUNSEL:** For LILLIEMAE VAZQUEZ, plaintiff:
Daniel Cherner, Law Offices of Daniel Cherner, New
York, NY. Lawrence Omansky, New York, NY.

For CONEY ISLAND HOSPITAL, defendant: Jonathan
J. Somerstein, Schiavetti, Geisler etal, New York, NY.

For DR. TAN, defendant: Jonathan J. Somerstein, Sa-
mantha E. Quinn, Schiavetti, Geisler et al., New York,
NY.

For NYC HEALTH AND HOSPITALS CORPORA-
TION, defendant: Samantha E. Quinn, Schiavetti, Geis-
ler et al., New York, NY.

**JUDGES:** DEBORAH A. BATTS, United States Dis-
trict Judge.

**OPINION BY:** DEBORAH A. BATTS

**OPINION**

*ORDER*

DEBORAH A. BATTS, United States District
Judge.

Plaintiff asserts eleven causes of action against De-
fendants Maimonides Medical Center ("Maimonides")
and Dr. Joachim Kapalanga ("Dr. Kapalanga") including
violations of the Emergency Medical Treatment and Ac-
tive Labor Act ("EMTALA") *42 U.S.C. § 1395dd*, medi-
cal malpractice, negligence, negligent infliction of emo-
tional distress, and intentional infliction of emotional
distress. Defendants Maimonides and Dr. Kapalanga
move to dismiss the First [*2] Amended Complaint in
its entirety.[1]

1 None of the remaining Defendants, including
New York City Health and Hospitals Corpora-
tion, Coney Island Hospital, Dr. Tan, and Dr.
Yousef, join in this motion to dismiss.

For the following reasons, Defendants' Motion to
Dismiss is GRANTED.

I. BACKGROUND

On May 29, 1998 at 4:30 a.m., Plaintiff Lilliemae
Vazquez ("Vazquez") noticed that her four year-old son,
Peter Salinas ("Salinas"), had a fever. (Am. Compl. PP
14-15.) After realizing that her son's fever was not com-
ing down, Vazquez called her health care provider and
was advised to take her son to a hospital emergency
room. (Am. Compl. P 16.) At 8:00 a.m. Vazquez brought
her son to non-moving Defendant Coney Island Hospi-
tal's emergency room. (Am. Compl. P 17.) Coney Island

Case 3:14-cv-00228-WWE   Document 16-1   Filed 04/29/14   Page 13 of 27

Page 2
2000 U.S. Dist. LEXIS 5614, *

Hospital is a hospital that receives federal funds, including Medicaid funds. (Am. Compl. P 8.)

Vazquez was advised to take her son to the pediatric section within the emergency room. (Am. Compl. P 18.) There, nurse's aides attended to Salinas [*3] by taking his temperature and drawing blood. *(Id.)* Vazquez then spoke with a Dr. Kappi and pointed out that her son had red spots below his knees. ²

> 2    Although named as a Defendant in Plaintiffs' original Complaint, claims against Dr. Kappi appear to have been voluntarily dismissed pursuant to Plaintiffs' First Amended Complaint.

While at Coney Island Hospital, Plaintiff alleges that Dr. Kappi and a Dr. Tan refused to test her son for meningitis, explaining that it would require a spinal tap, which would put Salinas at risk of becoming paralyzed or crippled. (Am. Compl. PP 21 & 35.) Moreover, Plaintiff alleges that her son was placed in a storage room, hypodermic needles were left on his bed, alcohol pads were left on his bed, and the bed he was in was filthy. *(Id.* at 25 & 44.)  In addition, Vazquez contends that while her son was in the alleged storage room, an unnamed doctor, Dr. Jane Doe, entered and took Salinas' temperature, which registered 104 degrees Fahrenheit. *(Id.* at 26.) Plaintiff [*4]  contends further that not one of the doctors who treated Salinas believed he had meningitis, it was suggested to Vazquez that her son had an airborne bacteria rather than meningitis, and some time before Salinas was to be transferred to Maimonides his body turned black but no one would tell Vazquez what was wrong with him. *(Id.* at 19, 20, 29, 35, 39 & 43.)

Eventually, a specialist from moving Defendant Maimonides arrived and began speaking with Dr. Tan. (Am. Compl. P 49.) Dr. Tan told Vazquez that her son would have to be transferred to Maimonides. (Am. Compl. P 52.) Defendant Maimonides is a hospital that receives federal funds, including Medicaid funds. (Am. Compl. P 9.)

In the ambulance ride to Maimonides, Vazquez asked the specialist from Maimonides what was wrong with her son and he told her to ask Dr. Tan. (Am. Compl. P 53.) When Salinas arrived at Maimonides he was taken to the K-2 Pediatric Special Care Unit. ³ (Am. Compl. P 54.)

> 3    Defendants contend in their Motion to Dismiss that Salinas was brought into the Pediatric Intensive Care Unit at Maimonides Medical Center, not the Pediatric Special Care Unit. (Defs.' Mot. Dismiss at 4.)

[*5]  Vazquez went to meet her son and alleges that she saw an orderly poking at him while looking for a good vein from which to take blood. (Am. Compl. P 55.) Around that time, Plaintiff alleges that moving Defendant Dr. Kapalanga entered the room wearing blue jeans and a t-shirt, without a protective mask, and introduced himself. (Am. Compl. P 56.) At this time Vazquez was asked to leave the room. *(Id.)*

Once Vazquez was allegedly "forced" from the room, Plaintiff claims several individuals spoke to her, including a counselor who informed her that her son had meningitis, but would be fine. (Am. Compl. P 57.)

Plaintiff further alleges that her son was placed on a machine to sedate or stabilize him. (Am. Compl. P 58.) She was told her son was fighting the machine, his tongue was hanging out of his mouth, and he was convulsing. *(Id.)*

Vazquez suggested to individuals present that her son be taken off the machine and that the tube be removed but was informed that her son would bleed to death if these requests were granted. (Am. Compl. P 59.)

Apparently, Vazquez reentered the room, began to talk to her son, and held his hand in an attempt to calm him down. (Am. Compl. P 60.) Plaintiff [*6]  was initially told to leave the room and then was allegedly "forced" out again. *(Id.)* Some time after Vazquez was allegedly "forced" from the room, she heard screaming, returned to the room, and found that various machines were turned off and the machine indicating a heart beat was flat. (Am. Compl. P 61.)

According to Plaintiff, her son suffered from respiratory failure and/or cardiac arrest before he passed away. (Am. Compl. P 63.) On Salinas' death certificate, Dr. Kapalanga stated that he had died of "natural causes" at 5:34 a.m.. (Am. Compl. P 64.)

## II. DISCUSSION

"On a motion to dismiss under *Rule 12(b)(6)*, the court must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff." *Harris v. City of New York, 186 F.3d 243, 247 (2d Cir. 1999).* "The district court should grant such a motion only if, after viewing plaintiff's allegations in this favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.*

### A. Emergency Medical Treatment and Active Labor Act (EMTALA): *42 U.S.C. § 1395dd* [*7]

It is well settled that EMTALA is not a federal malpractice statute. "Congress did not intend to expose defendant hospitals to attack along a new flank. Nor did it intend to turn the federal courts into fora for state malpractice claims." *Hart v. Mazur, 903 F. Supp. 277, 280*

*(D.R.I. 1995). See also Correa v. Hospital of S.F., 69 F.3d 1184, 1192 (1st Cir. 1995)* ("EMTALA does not create a cause of action for medical malpractice."). In fact, "Congress enacted EMTALA in 1986 'in response to a growing concern that hospitals were "dumping" patients unable to pay, by either refusing to provide emergency medical treatment or transferring patients before their emergency conditions were stabilized.'" *Reynolds v. Mercy Hosp., 861 F. Supp. 214, 219 (W.D.N.Y. 1994)* (citing *Brooks v. Maryland Gen. Hosp. Inc., 996 F.2d 708, 710 (4th Cir. 1992)). See also Marshall v. East Carroll Parish Hosp. Serv. Dist., 134 F.3d 319, 322 (5th Cir. 1998); Correa, 69 F.3d at 1189 (1st Cir.1995),* (citing H.R.Rep. No. 241(I), 99th Cong., 1st Sess. 27 (1986), reprinted in U.S.C.C.A.N. 42, 605).

EMTALA requires hospitals [*8] to adopt certain screening and stabilization procedures. [4] Moreover, an "appropriate medical screening examination" under EMTALA "is not judged by its proficiency in accurately diagnosing the patient's illness, but rather by whether it was performed equitably in comparison to other patients with similar symptoms." *See Marshall 134 F.3d at 322.* Also, if a hospital determines that an individual has an emergency medical condition, pursuant to EMTALA, the hospital is required to provide further examination and treatment in an effort to "stabilize" the patient before discharging or transferring the individual to another medical facility. *See Jones v. Garcia, 936 F. Supp. 929 (M.D.Fla. 1996).* Plaintiffs allege Defendants violated EMTALA's screening and stabilization requirements.

4   *42 U.S.C. § 1395dd*, in relevant part states:

(a) In the case of a hospital that has a hospital emergency department, if any individual . . . comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition ... exists.

(b)(1) If any individual . . . comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either-

(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

(B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

. . .

(c) If an individual at a hospital has an emergency medical condition which has not been stabilized . . ., the hospital may not transfer the individual [accept in limited circumstances not applicable in the instant action].

[*9]   a. Screening

Each hospital must develop screening procedures to assess emergency medical conditions. "Having done so, it must apply them alike to all patients." *See Summers v. Baptist Med. Ctr. Arkadelphia, 91 F.3d 1132, 1138 (8th Cir. 1996).* Furthermore, the medical screening requirement applies only to patients who seek treatment from an emergency department. *Baber v. Hospital Corp. of Am., 977 F.2d 872,* (4th Cir. 1992).

The term "appropriate medical screening examination", as used in EMTALA, has been interpreted to require hospitals to apply uniform screening procedures to all individuals coming to the emergency room to determine if an emergency medical condition exists; essentially, the screening provision aims to prevent disparate treatment. *See Summers, 91 F.3d at 1138* ("Patients are entitled under EMTALA, not to correct or non-negligent treatment in all circumstances, but to be treated as other similarly situated patients are treated, within the hospital's capabilities.") (additional citations omitted). Moreover, Plaintiffs must allege that the hospital and physician departed from standard screening procedures in their treatment [*10] of the patient. *See Hutchinson v. Greater Southeast Community Hosp., 793 F. Supp. 6 (D.D.C. 1992).*

In other words, EMTALA's screening requirement applies to patients who were treated differently in a hospital's emergency room than other patients with the same or similar illness. Vazquez acknowledges her son was not treated in the Maimonides emergency room but was brought directly to intensive care. Further, Vazquez does not allege any disparate medical treatment by Maimonides or disparate medical treatment by any Maimonides Doctor towards her son. The Complaint does no more than allege that Defendants failed to screen adequately Plaintiff's son but provides no facts to suggest disparate treatment.

b. Stabilization

Plaintiff further alleges that Defendant Maimonides failed to "stabilize" Salinas' condition as set forth in *42*

U.S.C. § 1395dd(e)(a)(3). [5] The statute makes clear that a patient must be "stabilized" *before* being transferred *to* another hospital or released from a hospital. *42 U.S.C. 1395dd(c)*; (e)(a)(3). (emphasis added). Furthermore, even where the facts may support a finding of gross mis-diagnosis, [*11] no claim is stated under EMTALA absent allegations that the hospital deviated from its standard screening or stabilizing procedures. *Vickers v. Nash Gen. Hosp., 875 F. Supp. 313, 317 (E.D.N.C. 1995), aff'd 78 F.3d 139 (4th Cir. 1996)*.

> 5   The term "stabilize" means: ... to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility . . . . *42 U.S.C.A. § 1395dd(e)(3)(A)*.

Vazquez alleges that her son was transferred *to* Defendant Maimonides, that her son was treated there and, unfortunately, passed away. Vazquez does not allege any facts of disparate treatment by Defendant Maimonides towards her son, nor does she allege that Defendant Maimonides transferred or released Salinas. Plaintiffs' Amended Complaint, though relating tragic events, is devoid of any [*12] facts alleging that Defendants deviated from their standard procedures in any way.

Consequently, for the reasons stated, Plaintiff has failed to state a claim under EMTALA as to Defendants Maimonides and Dr. Kapalanga. Accordingly, Plaintiff's federal claims against Defendants Maimonides and Dr. Kapalanga are hereby DISMISSED.

**B. Supplemental Jurisdiction**

The Court having dismissed all federal claims now dismisses the Plaintiffs' state law claims pursuant to *28 U.S.C § 1367(c)*. Although *section 1367(a)* provides this Court with supplemental jurisdiction, the Court declines to exercise its jurisdiction pursuant to 1367(c) for lack of any remaining federal claims.

The decision to dismiss state law claims is left to the sound discretion of the district judge. *Ametex Fabrics, Inc. v. Just In Materials, Inc., 140 F.3d 101, 105 (2d Cir. 1998)* (citing *Purgess v. Sharrock, 33 F.3d 134, 138 (2d Cir. 1994))*. Furthermore, when claims are dismissed before trial, the balance of factors will lean towards declining to exercise jurisdiction. *See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7, 98 L. Ed. 2d 720, 108 S. Ct. 614 (1988)*. [*13]

Accordingly, as this Court has dismissed Plaintiffs' federal claim, Plaintiffs' pendent state claims are hereby DISMISSED.

**III. CONCLUSION**

For the reasons stated above, Defendants' Motion to Dismiss is GRANTED. Plaintiffs have failed to state a claim under the Emergency Medical Treatment and Active Labor Act *42 U.S.C. § 1395dd*. The Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims. Accordingly, this action is DISMISSED as against Defendants Maimonides and Dr. Kapalanga.

SO ORDERED.

Dated: New York, New York

February 3, 2000

Deborah A. Batts

U.S.D.J



**David Martin et al. v. John Keggi, M.D. et al.**

**CV126013037**

**SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF WATER-BURY AT WATERBURY**

*2013 Conn. Super. LEXIS 462*

**March 5, 2013, Decided**
**March 5, 2013, Filed**

**NOTICE:** THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**JUDGES:** [*1] Vincent E. Roche, J.

**OPINION BY:** Vincent E. Roche

**OPINION**

MEMORANDUM OF DECISION RE MOTION TO DISMISS #103

Issue: Whether the court should grant the defendant's motion to dismiss those portions of the complaint asserting claims against unidentified "servants, agents, apparent agents and/or employees" and claims of institutional negligence, on the ground that plaintiff has not submitted sufficient opinion letters pursuant to General Statutes *§52-190a*.[1]

1 *General Statutes §52-190a* provides in relevant part: "(a) No civil action or apportionment complaint shall be filed unless the attorney or party filing the action or apportionment complaint has made a reasonable inquiry as permitted by the circumstances to determine that there are grounds for a good faith belief that there has been negligence in the care or treatment of the claimant . . . To show the existence of such good faith, the claimant or the claimant's attorney . . . shall obtain a written and signed opinion of a similar health care provider, as defined in *section*

*52-184c*, which similar health care provider shall be selected pursuant to the provisions of said section, that there appears to be evidence of medical negligence and includes a detailed basis [*2] for the formation of such opinion . . .

"(c) The failure to obtain and file the written opinion required by subsection (a) of this section shall be grounds for the dismissal of the action."

FACTS

On January 11, 2012, the plaintiffs, David Martin[2] and Diane Martin, filed a five-count complaint against the defendants, John Keggi, Orthopaedics New England, P.C., Saint Mary's Hospital, Inc. and Greater Waterbury Health Network, Inc. (Waterbury Hospital).[3] The complaint was accompanied by an opinion letter from a board certified orthopedic surgeon, which opined that Keggi had deviated from the acceptable standard of care in connection with the surgery and treatment of the plaintiff's right hip and right leg. The plaintiff pleads medical negligence against the defendant in count four. In count five, Diane Martin claims loss of consortium against all of the named defendants.

2 David Martin will be referred to as "the plaintiff."
3 Waterbury Hospital will be referred to as "the defendant."

The plaintiff alleges the following relevant facts. The plaintiff received continuous care, treatment, monitoring, diagnosing and supervision from the defendant and its "servants, agents, apparent agents and/or [*3] employees" from July 2006 until November 11, 2010. The plaintiff received treatment for an infection in his

right leg and prosthetic right hip at the defendant hospital. Keggi consequently performed surgery to remove the plaintiff's failed hip replacement at the defendant hospital. The plaintiff continued to suffer infections and received treatment from the defendant until November 11, 2010.

The plaintiff further alleges that, at all relevant times, Keggi was a "servant, agent, apparent agent and/or employee" of the defendant. The defendant and its "servants, agents, apparent agents and/or employees" had concurrent control and acted in concert with all the co-defendants as to the care, treatment, monitoring, diagnosis and supervision of the plaintiff. The defendant "deviated from the accepted standards of care . . . based on the standards of care for treatment of lower extremity orthopedic surgery and hip replacement and prosthesis surgery . . ." One or more of the negligent acts of the defendant and its deviation from the standard of care was a substantial contributing factor in causing injuries to the plaintiff.

Specifically, the plaintiff alleges that the defendant: (a) "failed to  [*4] adequately and properly treat, care for, diagnose, monitor and supervise the medical condition of the plaintiff"; (b) "failed to properly address the infection in the plaintiff's right hip, right leg and right femur"; (c) "failed to intervene to remedy the plaintiff's medical condition in a timely fashion"; (d) "failed to timely ascertain that the hip replacement was loose or not properly set"; (e) "failed to address the loose or improperly set hip replacement"; (f) "failed to take precautions or employed improper procedures to prevent or address infection of the plaintiff's right hip, right femur and right leg during the surgeries"; (g) "failed to properly educate the plaintiff on his post-operative care"; (h) "failed to timely refer the plaintiff to an infection specialist"; (i) "failed to properly address or treat the infection in the plaintiff's right leg over the period of treatment"; (j) "failed to ensure the stability of the hip replacement over the period of treatment"; (k) "failed to promulgate or enforce rules, regulations, standards and protocols for patients such as the plaintiff"; and (l) "failed to provide personnel who possessed the requisite training, skill, knowledge  [*5] and experience to care for, treat, monitor, diagnose and supervise patients such as the plaintiff."

On February 14, 2012, the defendant filed a motion to dismiss along with a memorandum of law supporting its motion (#103). On January 25, 2013, the plaintiff filed an objection along with a memorandum in opposition (#121). The defendant filed a reply on January 25, 2013 (#122). Oral argument on this matter was heard at short calendar on January 28, 2013.

DISCUSSION

In a medical malpractice action, "[t]he failure to provide a written opinion letter, or the attachment of a written opinion letter that does not comply with *§52-190a*, constitutes insufficient process and, thus, service of that insufficient process does not subject the defendant to the jurisdiction of the court . . . The jurisdiction that is found lacking, however, is jurisdiction over the person, not the subject matter." (Citation omitted; internal quotation marks omitted.) *Morgan v. Hartford Hospital, 301 Conn. 388, 401-02, 21 A.3d 451 (2011).* "[A] motion to dismiss pursuant to *§52-190a(c)* is the only proper procedural vehicle for challenging deficiencies with the opinion letter, and . . . dismissal of a letter that does not  [*6] comply with *§52-190a(c)* is mandatory . . ." *Bennett v. New Milford Hospital, Inc., 300 Conn. 1, 29, 12 A.3d 865 (2011).*

"When a trial court decides a jurisdictional question raised by a pretrial motion to dismiss on the basis of the complaint alone, it must consider the allegations of the complaint in their most favorable light . . . In this regard, a court must take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader." (Internal quotation marks omitted.) *Conboy v. State, 292 Conn. 642, 974 A.2d 669 (2009).* "The motion to dismiss . . . admits all facts which are well pleaded, invokes the existing record and must be decided upon that alone." (Internal quotation marks omitted.) *Bennett v. New Milford Hospital, Inc., supra, 300 Conn. at 10-11.*

The court notes that there is no procedural mechanism to dismiss paragraphs contained within a count. In this case, the better practice would have been for the defendant to file a request to revise the complaint to force the plaintiff to allege claims separately. Nevertheless, as the plaintiff did not object to the motion on these  [*7] grounds, in an abundance of caution the court will address the substance of the defendant's motion to dismiss.

I

The court first considers whether the complaint conforms to *§52-190a* regarding claims against "servants, agents, apparent agents and/or employees," other than Keggi. The defendant, Waterbury Hospital argues that the plaintiff's claims that it is vicariously liable for the actions of any person, other than Keggi, must be dismissed because the opinion letter attached to the complaint is authored by a board certified orthopedist and, therefore, can only relate to vicarious liability for the conduct of Keggi. The plaintiff counters that Keggi's negligence, which is outlined in the opinion letter, provides the basis for negligence as to the defendant, and there is no need to provide opinion letters regarding the

standard of care of every employee who may have participated in his care.

The defendant concedes that the opinion letter from the board certified orthopedic surgeon is sufficient as to Keggi. The question is whether that single opinion letter is also sufficient to attest to the defendant's vicarious liability for the actions of other, unidentified hospital staff. Connecticut's [*8] appellate courts have not reached this issue, and Superior Court decisions are not unanimous.

"The majority of Superior Court decisions have held that where the counts sought to be dismissed contain allegations of the principal being vicariously liable for its agent, whether stated expressly or by incorporation of prior counts, if the opinion letter is sufficient as to the agent physician, it is also sufficient to satisfy *§52-190a* as to the principal non-individual defendants." *Cataldo v. Zuccala, Superior Court, judicial district of Danbury, Docket No. CV 08 5004961, 2009 Conn. Super. LEXIS 2233 (August 11, 2009, Shaban, J.)*. The majority line of cases follows the reasoning in *Ranney v. New Britain General Hospital, Superior Court, judicial district of New Britain, Docket No. CV 06 5000954, 2006 Conn. Super. LEXIS 2809 (September 18, 2006, Rittman, J.)*, in determining whether the opinion letter is sufficient as to non-individual defendants under *§52-190a*. In *Ranney*, the plaintiff brought a medical negligence action regarding the delivery of her child against a number of physicians, alleged to be agents, servants and employees of the medical center that employed them, and the hospital where the delivery took place. The hospital moved to dismiss [*9] the allegations on the ground that the opinion letter, authored by a physician board certified in obstetrics and gynecology, was insufficient to meet the requirements of *§52-190a* because the physician who authored the opinion letter failed to note how each of the agents, servants, and employees named in the complaint participated in the care of and decisions regarding the plaintiff.

The *Ranney* court held that the opinion letter sufficiently satisfied *§52-190a*, stating "[t]he statute does not require the plaintiff to identify the name of each individual who acted on behalf of a corporate defendant, either in the complaint or in the written opinion. Nor does the statute presuppose that the opinion expressed in writing appended to the complaint would obviate the need for further pleading and discovery by both sides in such a lawsuit. Were there to be either of those requirements, plaintiffs would likely face insurmountable barriers to commencing and maintaining medical malpractice actions. As *[§52-190a]* and its history make clear, the legislature intended to place significant, but not insurmountable, obstacles in the path of plaintiffs who, the legislature determined, might otherwise institute [*10]

meritless claims." *Id.*; see also *Ryan v. Litchfield Hills Orthopedic Associates, LLP, Superior Court, judicial district of Litchfield, Docket No. CV 08 5003164, 2008 Conn. Super. LEXIS 2704 (October 22, 2008, Pickard, J.)*; *DeMaio v. John Dempsey Hospital, Superior Court, complex litigation docket at Hartford, Docket No. X07 CV 06 5010472 (August 5, 2008, Berger, J.) (2008 Conn. Super. LEXIS 1996, 46 Conn. L. Rptr. 121)*; *Guido v. Hughes, Superior Court, complex litigation docket at Waterbury, Docket No. X10 CV 06 5004889, 2007 Conn. Super. LEXIS 2665 (October 17, 2007, Scholl, J.) (44 Conn. L. Rptr. 347)*; *Shankar v. Midstate Medical Center, Superior Court, judicial district of New Haven, Docket No. CV 07 6001269, 2007 Conn. Super. LEXIS 3068 (November 28, 2007, Bellis, J.) (44 Conn. L. Rptr. 595)*; *Hernandez v. Moss, Superior Court, judicial district of Waterbury, Docket No. CV 06 5000664, 2007 Conn. Super. LEXIS 1332 (May 31, 2007, Gallagher, J.)*. But see *Figueroa v. Donahue, Superior Court, judicial district of New Britain, Docket No. CV 07 5003920 (September 19, 2007, Pittman, J.) (2007 Conn. Super. LEXIS 2497, 44 Conn. L. Rptr. 243)* (when an "opinion letter does not differentiate between the failures of the defendant physician and those of the hospital group," it may be insufficient under *§52-190a*).[4]

    4   As the defendant points out, a claim must be dismissed when [*11] the plaintiff fails to provide an opinion letter of a similar healthcare provider to an employee whose conduct forms the basis for the inquiry as to whether there was a breach of any duty owed to the plaintiff for which institutional defendants would be vicariously liable. *Wilkins v. Connecticut Childbirth & Women's Center, 135 Conn.App. 679, 689-90, 42 A.3d 521*, cert. granted, *305 Conn. 921, 47 A.3d 881 (2012)*. The Appellate Court in *Wilkins* held that an opinion letter authored by board certified obstetrician and gynecologist that focused on the alleged negligence of a person trained and experienced in nurse midwifery or nursing, was insufficient to support an action against institutional defendants under *§52-190a*. *Id.* In the present case, the claims against the defendant hospitals are based on the alleged negligence of Keggi, a physician board certified in orthopedic surgery. The defendant does not dispute that the opinion letter is sufficient as to Keggi. *Wilkins*, where no sufficient opinion letter was attached as to any allegedly negligent employee, is therefore not applicable.

The court agrees with the reasoning of the majority of decisions, which hold that if a written opinion [*12] is sufficient for at least one agent or employee of a medical institution, it is sufficient for the medical institution

under a theory of vicarious liability. The plaintiff alleges that Keggi was an agent of the defendant. Because the defendant concedes that the opinion letter is sufficient to satisfy the requirements of *§52-190a* as to Keggi, an opinion letter is not needed for Waterbury Hospital's other employees. The defendant's motion to dismiss those portions of the complaint asserting claims against unidentified "servants, agents, apparent agents and/or employees" is denied.

II

The court next considers whether the complaint conforms the requirements of *§52-190a* regarding claims purported to be of institutional negligence. The defendant claims that the portions of the complaint alleging institutional negligence must be dismissed because the opinion letter attached to the complaint fails to address allegations that the defendant hospitals were negligent by failing to promulgate certain rules and regulations and by failing to provide personnel who possessed the requisite skill and training. The plaintiff argues that his claims regarding the defendant's procedures are not medical malpractice [*13] claims, and therefore do not require an opinion letter by a similar healthcare provider. The plaintiff additionally asserts that he alleges facts that, when developed through discovery, will establish that the rules and protocols of the defendant hospitals were insufficient to protect the plaintiff from injury.

There is no appellate authority addressing the definition of "similar health care providers" in relation to institutional defendants. Although our Appellate Court addressed the meaning of the language "similar health care provider" in *Bennett v. New Milford Hospital, Inc., 117 Conn.App. 535, 545, 979 A.2d 1066 (2009),* aff'd, *300 Conn. 1, 12 A.3d 865 (2011),* the court specifically limited its holding to apply to the defendant physician, and not to institutional defendants. "In resolving the issues presented in this appeal, we need not address medical malpractice claims against institutional defendants. We note, however, that there may be a gap in *§52-190a* regarding such defendants appropriate for the legislature to address because this is an area that, to the extent possible, should be addressed by specific statutory language rather than by judicial interpretation." *Id., at 548 n.10.*

A [*14] number of Superior Court decisions, however, have addressed the meaning of the phrase "similar health care provider" as it pertains to institutional defendants. This court agrees with the reasoning of the majority of decisions, which hold that the written opinion

is sufficient for the medical institution if it is sufficient for at least one agent or employee of the medical institution. "The statute does not require the plaintiff to identify the name of each individual who acted on behalf of the corporate defendant, either in the complaint or in the written opinion. Nor does the statute presuppose that the opinion expressed in writing appended to the complaint would obviate the need for further pleading and discovery by both sides in such a lawsuit. Were there to be either of those requirements, plaintiffs would likely face insurmountable barriers to commencing and maintaining medical malpractice actions. As the new legislation and its history make clear, the legislature intended to place significant, but not insurmountable, obstacles in the path of plaintiff who, the legislature determined, might otherwise institute meritless claims." (Internal quotation marks omitted.) [*15] *Strickland v. Bristol Hospital, Inc., Superior Court, judicial district of New Britain, Docket No. CV 09 5014599 (September 27, 2010, Swienton, J.) (2010 Conn. Super. LEXIS 2477, 50 Conn. L. Rptr. 641, 642).*

The defendant does not dispute that the opinion letter of the board certified orthopedic surgeon is sufficient to satisfy the requirements of *§52-190a* for a similar health care provider with respect to Keggi. Because this court agrees with the majority of Superior Court decisions, which have held that an opinion letter is sufficient for a medical institution if it is sufficient for at least one agent or employee of the medical institution, this written opinion appended to the plaintiff's complaint is sufficient to satisfy the requirements of *§52-190a.* The defendant's motion to dismiss portions of the complaint asserting institutional negligence is denied.[5]

> 5    As noted above, the defendant failed to file a request to revise. The court is not going to scrutinize individual paragraphs within counts to determine whether they give rise to distinct causes of action which require separate opinion letters under *§52-190a.* The [*16] opinion letter provided in the complaint is sufficient as to Keggi and is therefore sufficient as to the defendant.

CONCLUSION

Therefore, the defendant's motion to dismiss is denied because the opinion letter is sufficient as to Keggi and is therefore sufficient as to the defendant hospital and its agents and employees.

ROCHE, J.



BENNETT BLUMENKOPF, Executor of the Estate of Lola Blumenkopf, Plaintiff, v. KEVIN E. CONBOY, Defendant.

### NO. 3:08 CV 457 (MRK)

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

*2008 U.S. Dist. LEXIS 68237*

**September 5, 2008, Decided**
**September 8, 2008, Filed**

**COUNSEL:** [*1] For Bennett Blumenkopf, Exec Est of Lola Blumenkopf, Plaintiff: Meredith C. Braxton, LEAD ATTORNEY, Greenwich, CT.

For Kevin E. Conboy, MD, Defendant: Catherine S. Nietzel, Ilyssa H. Kelson, LEAD ATTORNEYS, Ryan, Ryan, Johnson & Deluca, Stamford, CT.

**JUDGES:** Mark R. Kravitz, United States District Judge.

**OPINION BY:** Mark R. Kravitz

**OPINION**

**RULING AND ORDER**

Connecticut law, which governs this diversity action, has special rules regarding medical malpractice actions that were enacted "to discourage the filing of baseless lawsuits against health care providers." *LeConche v. Elligers, 215 Conn. 701, 710-11, 579 A.2d 1 (1990)*. *Section 52-190a(a) of the Connecticut General Statutes* provides that "[n]o civil action . . . shall be filed" to recover damages on a medical negligence claim unless the attorney or plaintiff "has made a reasonable inquiry as permitted by the circumstances to determine that there are grounds for a good faith belief that there has been negligence in the care or treatment of the claimant." *Conn. Gen. Stat. § 52-190a(a)*. The statute also requires a medical malpractice plaintiff to attach to the "initial pleading" a certificate of the attorney or party filing the action "that reasonable inquiry gave rise to a good [*2] faith belief that grounds exist for" the action. *Id.* To demonstrate that such a good faith inquiry was conducted, the Connecticut Legislature amended the law in 2005 to require the plaintiff to attach to the complaint a "written and signed opinion of a similar health care provider . . . that there appears to be evidence of medical negligence and includes a detailed basis for the formation of such opinion." 2005 Conn. Acts 275 (amending *Conn. Gen. Stat. 52-190a(a)*). [1] Finally and importantly for the present motion, the statute states that the "failure to obtain and file the written opinion" of a similar health care provider "shall be grounds for the dismissal of the action." *Conn. Gen. Stat. § 52-190a(c)*. As the Connecticut Appellate Court held recently, "[t]he plain language of this new statutory subsection . . . expressly provides for dismissal of an action when a plaintiff fails to attach a written opinion of a similar health care provider to the complaint, as required by *52-190a(c)*." *Rios v. CCMC Corp., 106 Conn. App. 810, 822, 943 A.2d 544 (App. Ct. 2008)*. [2]

> 1   Speaking on the Senate floor in support of the 2005 amendment, Senator Andrew J. McDonald, the Senate chairman of the judiciary committee, [*3] stated that the provision being enacted into law "makes substantial improvements over the current system because it would require that [a] report be in writing and presented in a detailed fashion, and a copy of that report, with the name of the doctor supplying it expunged, would be attached to the complaint as an exhibit. The failure to attach such an opinion would require the court to dismiss the case." 48 S. Proc., Pt. 14, 2005 Sess., at 4411; *see also Rios v. CCMC Corp., 106 Conn. App. 810, 822 n.9, 943 A.2d 544 (2008)*.
>
> 2   The parties do not dispute that the requirements of *Conn. Gen. Stat. § 52-190a* apply to di-

Case 3:14-cv-00228-WWE   Document 16-1   Filed 04/29/14   Page 21 of 27

Page 2
2008 U.S. Dist. LEXIS 68237, *

versity actions in federal court. In deciding whether to apply state law requirements in diversity cases, federal courts must keep in mind the twins goals of "discouragement of forum-shopping and avoidance of inequitable administration of the laws." *Hanna v. Plumer, 380 U.S. 460, 468, 85 S. Ct. 1136, 14 L. Ed. 2d 8 (1965); see also Semtek Int'l Inc. v. Lockheed Martin Corp., 531 U.S. 497, 121 S. Ct. 1021, 149 L. Ed. 2d 32 (2001); RLS Assocs., LLC v. United Bank of Kuwait PLC, 464 F. Supp. 2d 206, 213 (S.D.N.Y. 2006)*("[A] court should ask whether the application of the [state] rule would make so important a difference to the character or result of the litigation   [*4] that failure to enforce it would unfairly discriminate against the citizens of the forum State, or whether application of the rule would have so important an effect upon the fortunes of one or both of the litigants that failure to enforce it would be likely to cause a plaintiff to choose the federal court.")(quotation marks omitted)). The Court has no doubt that if federal courts did not apply the requirements of *Conn. Gen. Stat. § 52-190a,* litigants would be more likely to bring medical malpractice suits in federal court. Other courts in this district have agreed. *See, e.g., Rzayeva v. United States, 492 F. Supp. 2d 60, 84-85 (D. Conn. 2007)* (dismissing medical malpractice claim for failure to satisfy requirements of *Conn. Gen. Stat. § 52-190a*).

The Executor of Ms. Blumenkopf's Estate filed this single-count medical malpractice case against Ms. Blumenkopf's former physician in April 2008. No certificate of counsel or opinion of a similar health care provider was attached to the initial Complaint [doc. # 1], though paragraph 17 of the Complaint stated that the undersigned counsel had made a reasonable inquiry to determine that there were grounds for a good faith belief that there was   [*5] negligence in the care of Ms. Blumenkopf. On June 12, 2008, the Court held a scheduling conference with the parties and *sua sponte* raised with Plaintiff's counsel the fact that no medical opinions were attached to the Complaint. Plaintiff's counsel said he would promptly file an amended complaint to correct that oversight. On July 1, 2008, Plaintiff's counsel filed an Amended Complaint [doc. # 11] and attached the reports of three physicians, whose names were redacted as required by statute.

Thereafter, Dr. Conboy filed a Motion to Dismiss [doc. # 15] the Amended Complaint on two independent grounds: (1) the original Complaint failed to include the required opinion and certificate, thereby depriving this Court of jurisdiction to consider the Amended Complaint; and (2) the reports attached to the Amended Complaint do not comply with the requirements of *Conn. Gen. Stat. § 52-190a(a).* The Court need not, and does not, decide whether a plaintiff can amend a complaint to add the certificate and opinions required by Connecticut law. That is a question for another day. For even if Plaintiff were permitted to add the required certificate and opinions by way of an amended complaint, the reports [*6] attached to the Amended Complaint do not comply with *Conn. Gen. Stat. § 52-190a(a).* Therefore, the Court grants Dr. Conboy's Motion to Dismiss.

As noted by the Connecticut Appellate Court in *Rios,* the language of *§ 52-190a(a)* is "plain and unambiguous." *106 Conn. App. at 822 n.9.* The statute requires a medical malpractice plaintiff to attach to the complaint "a written and signed opinion of a similar health care provider . . . that there appears to be evidence of medical negligence and includes a detailed basis for the formation of such opinion." *Conn. Gen. Stat. § 52-190a(a).* As several Connecticut Superior Courts have noted, the opinion required by *§ 52-190a(a)* need not "exhaust the subject matter or be exquisitely precise in detail." *Figueroa v. Donahue, No. HHBCCV075003920, 2007 Conn. Super. LEXIS 2497, at * 7 (Sup. Ct. Sept. 19, 2007); see also Walton v. Caffrey, No. CV065000857S, 2007 Conn. Super. LEXIS 1098, at * 11 (Super. Ct. May 4, 2007)* (Plaintiff is not required to supply the defendant "with every single detail that one would normally obtain after conducting discovery."). Nevertheless, the statute requires the plaintiff to attach an "opinion" stating that there appears to   [*7] be evidence of medical malpractice and providing a "detailed basis for the formation of that opinion." *Conn. Gen. Stat. § 52-190a(a).* And Connecticut Superior Courts have consistently insisted on compliance with these provisions. *See, e.g., Malizia v. Zarif, No. CV075006578S, 2008 Conn. Super. LEXIS 1150, at * 8 (Conn. Super. Ct. May 1, 2008)* (dismissing case because opinion letter "provides no illumination as to what is the standard of care or on what basis it was violated"); *Figueroa, HHBCV075003920, 2007 Conn. Super. LEXIS 2497, at * 6* (stating that the statute requires that "there be some basis . . . upon which one could conclude that the person rendering the opinion was qualified to state such an opinion and had a basis for such opinion"); *Landry v. Zborowski, 44 Conn. L. Rptr. 5, 57, 2007 Conn. Super. LEXIS 2253 (Super. Ct. Aug. 21, 2007)* ("[S]ubsection (a) requires a detailed opinion, not a conclusory opinion."); *McQuillen v. Connecticut Fertility Assoc., Inc., No. CV065002262S, 2007 Conn. Super LEXIS 898, at *7 (Super. Ct. Apr. 10, 2007)* (dismissing case because the opinion "makes no reference to negligent medical care, any deviation from the standard of care or any language that can reasonably be inferred [*8] to suggest medical negligence").

In this case, the reports that Plaintiff attached to the Amended Complaint appear to be treatment records of Ms. Blumenkopf when she was alive and after she had been seen by Dr. Conboy. As Plaintiff's counsel confirmed during an on-the-record telephonic conference on September 4, 2008, no "opinion" is attached to the Amended Complaint. Nor do any of the three reports state what standard of care was at issue or whether it was violated. Indeed, there is no reference to Dr. Conboy in any of the reports, and as a consequence, none of them states that Dr. Conboy appears to have committed medical malpractice, as required by the Connecticut statute.

During the telephonic conference with the Court, Plainitff's lawyer repeatedly argued that there are "indications" in the treatment records that Ms. Blumenkopf suffered from severe aortic stenosis dating back several years and that Dr. Conboy had either failed to uncover that condition or negligently overlooked it. But the treatment records are not as clear as counsel contends. In fact, one of the reports attached to the Amended Complaint states that Ms. Blumenkopf was suffering from only "mild aortic stenosis." [*9] And most of the reports describe Ms. Blumenkopf as a "complex" patient suffering from multiple maladies. Even the statement on which counsel places most reliance concludes that "the information [regarding severe aortic stenosis] was either not considered to be significant or overlooked," without any indication whether either of these suppositions would violate the relevant standard of care.

More importantly, neither Plaintiff's counsel nor this Court are "similar health care providers" to Dr. Conboy, so it is irrelevant what we may think about what these treatment records indicate or suggest. Connecticut law

requires more than counsel's good faith belief, based on treatment records, that malpractice occurred. Instead, it requires an assessment of those records by a similar health care provider, *not* a lawyer, before a lawsuit is brought, and it requires the plaintiff to attach the similar health care provider's written opinion to the complaint. The treatment records attached to the Amended Complaint do not come even close to satisfying these statutory requirements; as previously noted, the reports do not even mention Dr. Conboy's name, let alone opine that he committed malpractice. Indeed, [*10] during the telephonic conference, Plaintiff's lawyer represented that he had obtained an opinion of a cardiologist that Dr. Conboy committed medical malpractice, but counsel acknowledged that none of the reports attached to the Amended Complaint was authored by this unidentified cardiologist and that the opinion he obtained is not attached to the Amended Complaint.

Because the treatment records attached to the Amended Complaint do not satisfy the requirements of *Conn. Gen. Stat. § 52-190a(a)* and because that statute provides that the "failure to obtain *and file*" the required written opinion is grounds for dismissal, the Court **GRANTS** Dr. Conboy's Motion to Dismiss [doc. # 15]. **The Clerk is directed to enter a judgment of dismissal and to close this file.**

IT IS SO ORDERED.

/s/ Mark R. Kravitz

United States District Judge

**Dated at New Haven, Connecticut: September 5, 2008.**



**EMIL D. ANGHEL, Plaintiff, v. SAINT FRANCIS HOSPITAL AND MEDICAL CENTER, Defendant.**

Civil No.3:03CV00864(AWT)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

*2005 U.S. Dist. LEXIS 5081*

**March 30, 2005, Decided**

**SUBSEQUENT HISTORY:** Appeal dismissed by, Motion denied by Anghel v. St. Francis Hosp. & Med. Ctr., 2009 U.S. App. LEXIS 21942 (2d Cir. Conn., Oct. 6, 2009)

**COUNSEL:** [*1] Emil D. Anghel, Plaintiff, Pro se, Hartford, CT.

For Saint Francis Hospital & Medical Center, Defendant: Mark J. Miley, William Joseph Scully, Cooney, Scully & Dowling, Hartford, CT.

**JUDGES:** Alvin W. Thompson, United States District Judge.

**OPINION BY:** Alvin W. Thompson

**OPINION**

*RULING ON MOTION TO DISMISS*

**I. BACKGROUND**

The *pro se* plaintiff filed an Amended Complaint (Doc. No. 22) on October 17, 2003, which alleges in five counts various statutory, common law, and constitutional causes of action against the defendant hospital as a result of treatment he received at the hospital on December 5, 2001. That afternoon and evening, the staff of the defendant's emergency room (the "E.R.") purportedly locked the plaintiff in bed restraints for seven hours and failed to provide the plaintiff with the necessary psychiatric treatment that he expected to receive. The defendant, St. Francis Hospital and Medical Center ("St. Francis"), has moved to dismiss the Amended Complaint on three grounds. For the reasons set forth below the court is granting the defendant's motion to dismiss the Amended Complaint, but giving the *pro se* plaintiff an opportunity to file a motion [*2] for leave to file a second amended complaint after a status conference with the court.

**II. LEGAL STANDARD**

Dismissal of a complaint pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure* for failure to state a claim upon which relief can be granted is not warranted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).* The task of the court in ruling on a *Rule 12(b)(6)* motion "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc., 748 F.2d 774, 779 (2d Cir. 1984)* (internal quotations omitted). The court is required to accept as true all factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff. *Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir. 1994).*

The court also notes that "this standard is applied with even greater [*3] force where . . . the complaint is submitted *pro se.*" [1] *Hernandez, 18 F.3d at 136.* When considering the sufficiency of the allegations in a *pro se* complaint, the court applies "less stringent standards than [those applied to] formal pleadings drafted by lawyers." *Haines v. Kerner, 404 U.S. 519, 520, 30 L. Ed. 2d 652, 92 S. Ct. 594 (1972); see also Branham v. Meachum, 77 F.3d 626, 628-29 (2d Cir. 1996).* Furthermore, the court should interpret the plaintiff's complaint "to raise the strongest arguments [it] suggests." *Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994).*

Case 3:14-cv-00228-WWE   Document 16-1   Filed 04/29/14   Page 24 of 27

Page 2
2005 U.S. Dist. LEXIS 5081, *

1   The court notes that the defendant argues at pages 2 to 3 of its reply memorandum (Doc. No.35) that the court should not apply the *pro se* liberal construction standard in this case because the Amended Complaint was, according to the plaintiff, drafted by an attorney. (*See* Pl.'s Opp. Mem. (Doc. No. 34) PP4 & 15.) *Presnick v. Bysiewicz, 297 F. Supp. 2d 431 (D. Conn. 2003)*, upon which the defendant relies, in contrast to the instant case involved a former attorney appearing *pro se*. Where, as here, the *pro se* plaintiff has never been an attorney, nor does he appear to be represented by one, the court does not think it appropriate to decline to give a liberal construction to the *pro se* plaintiff's Amended Complaint. In any case, as the court explains below, *even with* a liberal construction of the Amended Complaint, it must be dismissed.

[*4]   **III. *DISCUSSION***

Count One of the Amended Complaint alleges "unlawful restraint" pursuant to *Conn. Gen. Stat. §§ 46a-151, 152* and *153*, and *§ 17a-544*. Generally, *sections 46a-151 through 46a-153* govern the use of physical restraint, seclusion, and psychopharmacologic agents by certain health care institutions. *See Conn. Gen. Stat. Ann. §§ 46a-150 to 46a-153* (West 2004 & Supp.). Assuming *arguendo* that these statutes provide the plaintiff with a right of action against this defendant, [2] the plaintiff has failed to set forth facts that could support a claim for violation of these statutes. For instance, the plaintiff has failed to allege any facts that could be proved to show either that the plaintiff is a "person at risk" under *section 46a-150* or that the defendant is a "provider of care . . . of a person at risk" -- both of which must be the case in order for these statutes to apply. *See Conn. Gen. Stat. Ann. §§ 46a-151 to 46a-153*. Likewise, the Amended Complaint provides no factual allegation to support a claim under *§ 46a-151* that the defendants used "a life-threatening [*5] physical restraint" as defined by *section 46a-150(4)*.

2   Although the defendant does not challenge the plaintiff's ability to bring a private action under these statutes, the court notes that the instant statutes do not explicitly provide for a private cause of action. *See generally Antinerella v. Rioux, 229 Conn. 479, 495-497, 642 A.2d 699 (1994)* (discussing whether private cause of action exists where the statute is silent), *overruled on other grounds by Miller v. Egan, 265 Conn. 301, 325, 828 A.2d 549 (2003)*; *Napoletano v. CIGNA Healthcare, 238 Conn. 216, 249-253, 680 A.2d 127 (1996)* (same); *Ericksen v. Town of Rocky Hill*, No. CV93-0529218 S, 1995 WL 681551, at *1-3 (Conn. Super. Ct. Nov. 3, 1995) (same).

Similarly, *Connecticut General Statutes section 17a-544* does not allow the plaintiff to state a claim under Count One. For substantially the reasons set forth at pages 12 to 13 of the defendant's memorandum [*6] in support (Doc. No. 29) of its motion to dismiss, the court finds that this section does not apply to the E.R. or the Clinic. Likewise, the plaintiff's claims of "inhumane and indignified treatment" pursuant to *Conn. Gen. Stat. section 17a-542* and "improper diagnosis and care" pursuant to *Conn. Gen. Stat. section 17a-545* must fail, as these statutes are not applicable to the defendant in this case. *See Conn. Gen. Stat. Ann. § 17a-540(a)* ("'Facility' means any inpatient or outpatient hospital, clinic, or other facility for the diagnosis, observation or treatment of persons with psychiatric disabilities."); *see also Wiseman v. Armstrong, 269 Conn. 802, 810, 850 A.2d 114 (2004)* ("['Facility'] must be one for which the *main purpose* is diagnosis, observation or treatment [of persons with psychiatric disabilities].") (emphasis added). The Amended Complaint contains no factual allegations that would demonstrate that the E.R. is a "facility" as that term is defined in *section 17a-540(a)*.

To the extent that Count One attempts to set forth a tort claim for false imprisonment (*see* [*7] Am. Compl. (Doc. No. 22) P39), the Amended Complaint does not set forth factual allegations that would support a claim for false imprisonment. While the Amended Complaint sufficiently alleges that the defendant restrained the plaintiff's liberty, it does not present factual allegations that would establish the second element of the tort, namely, "that he did not consent to the restraint or acquiesce in it willingly." *Berry v. Loiseau, 223 Conn. 786, 820, 614 A.2d 414 (1992)* (internal citation and quotation marks omitted). The court notes that "in general, the plaintiff bears the burden of proving that the defendant was not privileged to act as he did." Richard L. Newman & Jeffrey S. Wildstein, *Tort Remedies in Connecticut* § 12-5(f) at 173 (1996 & Supp. 2004) (hereinafter "Newman") (citing *Beinhorn v. Saraceno, 23 Conn. App. 487, 491, 582 A.2d 208 (1990)* ("In order to prevail on her complaint, the plaintiff had the burden of proving that the arresting officer did not have probable cause to arrest her.")). Here, the plaintiff has failed to offer any factual allegations that would satisfy his burden of establishing (1) that the plaintiff did not [*8] consent or acquiesce to the restraint, or (2) that the defendant health care provider was not privileged in its restraint of the plaintiff.

Finally, paragraph 37 of Count One of the Amended Complaint alleges, without reference to any legal basis, that the defendant illegally discriminated against the plaintiff based on his national origin. The court notes that Section II. of Amended Complaint, entitled "Nature of

the Case", alleges constitutional violations under *42 U.S.C. section 1983* and *Title VII of the 1964 Civil Rights Act.* Assuming that the plaintiff's claim of illegal discrimination is founded on these statutes, the court must dismiss it. Any Title VII claim must fail because the plaintiff has alleged no facts that would prove that the plaintiff was an employee of the defendant, *see 42 U.S.C.A. § 2000e, et seq.* Any claim under *section 1983* must likewise fail because the Amended Complaint includes no facts that could satisfy the requirement that the defendant have acted "under color of [state law]." *42 U.S.C.A. § 1983.*

Count Two sets forth a claim for assault and battery pursuant to *Conn. Gen.* [*9] *Stat. Titles 53* and *53a. Titles 53* and *53a* deal with crimes; they provide no basis for a civil cause of action for assault or battery. Moreover, even if the court construes the plaintiff's claims as sounding in tort, they fail for reasons similar to the reasons which doom the plaintiff's false imprisonment claim. The Amended Complaint contains no factual allegations from which the court could draw a reasonable inference that the plaintiff had not permitted or consented to the defendant's treatment of him. *See Newman*, § 12-2(b)(2) (citing *Schmeltz v. Tracy, 119 Conn. 492, 495-96, 177 A. 520 (1935)* and § 12-2(b)(2) (Supp. 2004) (citing *Godwin v. Danbury Eye Physicians & Surgeons, P.C., 254 Conn. 131, 136, 757 A.2d 516 (2000)); see also, Newman*, § 12-2(b)(4) (plaintiff has burden of establishing lack of consent).

Count Three sets forth a claim for defamation pursuant to *Conn. Gen. Stat. § 52-237*. That section does not create a cause of action for defamation but merely provides limitations on damages in actions for *libel*. The only factual allegations in the Amended Complaint that conceivably could provide a basis [*10] for claims of defamation or libel are (1) that the medical assistant lied by stating to the DSS investigator and other medical staff that the plaintiff had expressed his intention to harm the Commissioner of DSS, (*see* Am. Compl. (Doc. No. 22) P28), and (2) that the E.R. staff fabricated the secondary diagnosis of "suicidal ideation" on the plaintiff's discharge form. (*See id.* P30.) Assuming *arguendo* that the Amended Complaint states facts that demonstrate the defendant published false statements about the plaintiff, it is devoid of factual allegations that show either the requisite harm to the plaintiff's reputation or statements falling within a *per se* category of defamation or libel. *See* Newman, §§ 15-1 - 15-2.

Count Four sets forth a claim for intentional infliction of emotional distress. In order to prevail on a claim for intentional infliction of emotional distress, the plaintiff must prove: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his con-

duct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's [*11] distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Appleton v. Bd. of Educ. of Town of Stonington, 254 Conn. 205, 210, 757 A.2d 1059 (2000)* (citations and quotation marks omitted). Liability for intentional infliction of emotional distress requires "conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." *Muniz v. Kravis, 59 Conn. App. 704, 708, 757 A.2d 1207 (2000)* (internal citations and quotation marks omitted). Putting aside the question of whether the Amended Complaint alleges any conduct which constitutes extreme and outrageous conduct, and the question of whether the plaintiff's distress was severe, the court finds that there are no factual allegations which could support a claim that the defendant's conduct was intentional -- that is, that its conduct in restraining the plaintiff was "especially calculated to cause" emotional distress. Accordingly, this claim must be dismissed.

Count Five sets forth a claim for violation of constitutional rights, including (1) the plaintiff's right to freedom [*12] of speech under the *First Amendment to the U.S. Constitution*, when the defendant refused to allow the plaintiff to use the telephone except for one brief call that was permitted only after five hours of detention; (2) the plaintiff's right to liberty under the *Fourth Amendment to the U.S. Constitution*; (3) the plaintiff's right to freedom from cruel and unusual punishment under the *Eighth Amendment to the U.S. Constitution.*; (4) the plaintiff's rights under the *Ninth Amendment to the U.S. Constitution*; (5) the plaintiff's right to freedom from discrimination based on national origin under the *Fifteenth Amendment to the U.S. Constitution*; and finally, (6) the plaintiff's right to "equal treatment" under Article IV of the U.S. Constitution.

The court must dismiss the plaintiff's *First Amendment* claim because the defendant is a private actor and the Amended Complaint alleges no facts that would show that the defendant is a state actor. *See Loce v. Time Warner Entm't Advance/Newhouse P'ship, 191 F.3d 256, 266 (2d Cir. 1999)* ("The *First Amendment* applies only to state actors."). For the same reason, the court must dismiss the plaintiff's *Fourth Amendment* claim, *see* [*13] *Glass v. Mayas, 984 F.2d 55, 58 (2d Cir. 1993)* (quoting *Graham v. Connor, 490 U.S. 386, 398 n.10, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989)*); his *Eighth Amendment* claim, *see Hudson v. Clark, 319 F. Supp. 2d 347, 351 (W.D.N.Y. 2004)*; and his *Fifteenth Amendment* claim [3], *see Sorenson v. Newark Star Ledger, 2004 U.S. Dist. LEXIS 14781, No. 04 Civ. 197(HB), 2002 WL 1725023, at *2 (S.D.N.Y. July 30, 2004)*. The court dismisses the plaintiff's *Ninth Amendment* claim because

that Amendment is merely a rule of construction which does not protect individual constitutional rights. *Rini v. Zwirn, 886 F. Supp. 270, 289 (E.D.N.Y. 1995)*. As for the final claim of the Fifth Count, which set forth a claim for violation of Article IV, the only conceivably applicable provision under that Article is privileges and immunities clause in section 2, clause 1. [4] The court must dismiss this claim because the U.S. Supreme Court has narrowly interpreted this clause "as a prohibition of local legislation that discriminates against non-residents", not as a source of individual constitutional rights. 2 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance* [*14] *and Procedure* § 11.10 at 190 (3d ed. 1999 & Supp. 2005). The Amended Complaint contains no factual allegations implicating this clause.

> 3   Moreover, there are no facts from which the court could draw a reasonable inference that the defendant's conduct somehow denied or abridged the plaintiff's right to vote.
> 4   "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." *U.S. Const. art. IV, § 2, cl. 1.*

While the court is dismissing each count of the Amended Complaint, the court agrees with the defendant that the gravamen of the Amended Complaint appears to sound in medical malpractice. [5] The plaintiff alleges that on December 5, 2001, after making an appointment, the plaintiff presented himself to the defendant's Outpatient Clinic for medical treatment for anxiety and depression. Staff in the Outpatient Clinic failed to treat the plaintiff to his satisfaction, at which point the staff transferred him to the E.R., where he was restrained to a bed. [*15] He complains that the E.R. staff failed to provide him with proper psychiatric care by improperly restraining him for seven hours and by misdiagnosing him as having suicidal ideation. According to the Amended Complaint this improper medical care resulted in personal injury, including physical weakness and severe stomach pain and irritation, as well as mental and emotional distress. [6] Without deciding whether the allegations in the Amended Complaint can be construed to state sufficiently a medical malpractice claim, the court concludes, for substantially the reasons set forth at page 9 of the defendant's memorandum in support (Doc. No. 29), that the plaintiff's claims, if any, would be more properly brought as a claim for medical malpractice.

> 5   While the court is dismissing the Amended Complaint, it notes that, had the plaintiff sufficiently pleaded other causes of action arising out of the defendant's treatment of the plaintiff, those claims could be pursued in lieu of, or alternatively with, any claim of medical malpractice. *See, e.g., Pascarelli v. Corning Clinical Laboratories,*

*Inc., 1997 Conn. Super. LEXIS 791, No. 325312, 1997 WL 155381, at *3 (Conn. Super. Ct. March 25, 1997)* (sustaining sufficiency of claim against health care provider for ordinary negligence where no expert medical testimony and, therefore, no good faith certificate needed); *Zabensky v. Lawrence & Memorial Hosp., 1999 Conn. Super. LEXIS 2085, No. 545872, 1999 WL 608673 (Conn. Super. Ct. Aug. 5, 1999)* (where independent, legally sufficient claims of breach of contract, invasion of privacy, battery, intentional infliction of emotional distress, breach of fiduciary duty, and CUTPA violations were brought against health care provider, no need to file good faith certificate under *section 52-190a* where plaintiff did not also plead medical malpractice).

[*16]

> 6   The court notes that the plaintiff's argument that the Amended Complaint does not allege personal injury (*see* Pl.'s Opp. Mem. (Doc. No. 34) P9) and that, therefore, is outside the ken of *section 52-190a*'s requirement of a good faith certificate, is without merit. *See Kilduff v. Adams, Inc., 219 Conn. 314, 337, 593 A.2d 478 (1991)* (plain meaning of "personal injury" includes emotional distress or mental anguish).

"Whether the plaintiff's cause of action is one for malpractice depends upon the definition of that word and the allegations of the complaint." *Barnes v. Schlein, 192 Conn. 732, 735, 473 A.2d 1221 (1984)* (citation omitted). "Malpractice is commonly defined as 'the failure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss, or damage to the recipient of those service . . . .'" *Id.* (quoting Webster, Third New International Dictionary). "To prevail in a medical [*17] malpractice action, the plaintiff must prove (1) the requisite standard of care for treatment, (2) a deviation from that standard of care, and (3) a causal connection between the deviation and the claimed injury." *Boone v. William W. Backus Hosp., 272 Conn. 551, 567, 864 A.2d 1 (2005)* (internal quotation marks, punctuation and citation omitted).

To bring a claim for medical malpractice, a plaintiff also must provide the certificate of good faith required by *Connecticut General Statutes section 52-190a.*

## IV. CONCLUSION

For the reasons set forth above and in deference to the plaintiff's *pro se* status, the plaintiff's Amended Complaint (Doc. No. 22) is hereby DISMISSED, but the plaintiff will be given an opportunity to file a motion for leave to file a second amended complaint within 45 days

after a status conference with the court. If the plaintiff fails to file a second amended complaint within 45 days after the status conference with the court, the court will dismiss this case.

A status conference in this case will be held April 11, 2005 at 9:30 a.m. in the South Courtroom of the Abraham A. Ribicoff Building, 450 [*18]  Main Street, Hartford, Connecticut.

It is so ordered.

Dated at Hartford, Connecticut this 30th day of March, 2005, at Hartford, Connecticut.

/s/

Alvin W. Thompson

United States District Judge